**In re TENNECOMP SYSTEMS, INC., Debtor.**

**Sharon BELL, Trustee, Plaintiff,**

v.

**PUBLIC SERVICE COMPANY OF OKLAHOMA, Defendant.**

**Bankruptcy No. 3–80–00164.**
**Adv. No. 3–80–0316.**

United States Bankruptcy Court, E. D. Tennessee.

June 25, 1981.

Richard Stair, Jr., Knoxville, Tenn., for plaintiff.

L. Caesar Stair, III, Knoxville, Tenn., for defendant.

## MEMORANDUM
CLIVE W. BARE, Bankruptcy Judge.

At issue in this adversary proceeding is whether the trustee may recover from the defendant goods shipped by the debtor to the defendant one day before the debtor filed a petition in bankruptcy. The trustee contends that the goods were the debtor's property at the time of shipment; therefore, the trustee is entitled to recover the goods under either 11 U.S.C. § 547(b)[1] or § 549(a).[2] The defendant generally alleges that the goods were not property of the debtor at the time of the transfer in that ownership had previously passed to the defendant. Defendant moves for summary judgment.

### I
The facts as presented to the court by the defendant's motion for summary judgment and the plaintiff's response thereto as argued by the parties at the hearing on that motion on December 18, 1980, are as follows:

1. On February 9, 1979, Tennecomp Systems, Inc. (Tennecomp) and Public Service Company of Oklahoma (PSO) entered into a contract under the terms of which Tennecomp was to build a security computer system for installation at PSO's Black Fox Station in Inola, Oklahoma.

2. The total contract price, including modifications, approximated $236,760.00, of

---

1. "Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—
    (1) to or for the benefit of a creditor;
    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
    (3) made while the debtor was insolvent;
    (4) made—
    (A) on or within 90 days before the date of the filing of the petition; . . .
    (5) that enables such creditor to receive more than such creditor would receive if—
    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and
    (C) such creditor received payment of such debt to the extent provided by the provisions of this title." 11 U.S.C. § 547(b).

2. "Except as provided in subsection (b) and (c) of this section, the trustee may avoid a transfer of property of the estate—
    (1) that occurs after the commencement of the case;
    . . . or
    (B) that is not authorized under this title or by the court." 11 U.S.C. § 549(a).

which amount, and pursuant to the provisions of the contract, the following partial payments were made to Tennecomp: $46,240.00 on March 1, 1979; $69,360.00 on March 30, 1979; $69,360.00 on July 11, 1979; and $23,120.00 on August 27, 1979. These payments, which totaled $208,080.00, represented 90% of the base contract price of $231,200.00. (*See* February 9, 1979, contract, *Basis of Contract*, Paragraph 8, Page BC–2 and Interrogatory No. 9 filed by the Plaintiff on August 26, 1980, and the answer thereto filed by the Defendant on October 1, 1980.)

3. It was standard policy at Tennecomp to assign a contract control number to all material and equipment utilized in the performance of a specific contract or job. This was done in order that Tennecomp might maintain internal accountability and control over the materials and equipment which it utilized in the performance of specific contracts, and this was the procedure followed in the PSO project with the internal accountability control number being AO3017 (*see* Affidavits of Charles L. Horn, Thomas Davis Adams, and Charles R. Nault).

4. On February 14, 1980, at the direction of Mr. Jon Eberle, President of Tennecomp, those goods set forth in Exhibit B to the Affidavit of Charles R. Nault were shipped from the Tennecomp facilities at 139–149 Robertsville Road, Oak Ridge, Tennessee, to PSO, Black Fox Station, Inola, Oklahoma. All of these goods were being utilized by Tennecomp in its manufacture of the PSO security computer system; all had been assigned the PSO accountability control number AO3017; and all had been segregated into a "staging area" at Tennecomp's facility where work on the PSO contract was being performed. (*See* Affidavits of Charles L. Horn, Thomas Davis Adams, and Charles R. Nault.)

5. On February 18, 1980, PSO received delivery of the February 14, 1980, shipment of goods from Tennecomp. (*See* Interrogatory No. 1 filed by plaintiff on August 26,

1980, and the defendant's answer thereto filed on October 1, 1980).

6. On February 12, 1980, PSO was advised by the president of Tennecomp that Tennecomp intended to file a petition in bankruptcy. (*See* Interrogatory Nos. 5, 6 filed by the plaintiff on August 26, 1980, and the defendant's answers thereto filed on October 1, 1980.)

7. On February 15, 1980, Tennecomp filed its voluntary petition in bankruptcy under Chapter 7 of Title 11 of the United States Code.

The parties have agreed that Oklahoma law governs the contractual relationship existing between Tennecomp and PSO as a result of the February 9, 1979, contract. (*See* Paragraph GC.34 of the General Conditions Section of the February 9, 1979, contract as set forth at Page GC–20.)

II

According to the plaintiff, the sole issue to be determined by the court in ruling on the defendant's motion for summary judgment is whether the February 14, 1980, shipment of goods from Tennecomp to PSO was a "transfer of property of the debtor" under either § 547 (Preferences) or a "transfer of property of the estate" under § 549 (Postpetition Transactions) of the Bankruptcy Code, or whether the sales provisions of the Uniform Commercial Code changed the character of that transfer so as to remove it from a transfer of property of the debtor or the estate as those terms are used in the Bankruptcy Code.[3]

The defendant asserts that under the applicable provisions of the Uniform Commercial Code, i. e., Okla.Stat.Ann. tit. 12A §§ 2–401, 2–402, 2–501, and 2–716, by virtue of identification of the goods to the contract, PSO acquired a special property right in the goods and thus would have had the right to recover the goods had they not been shipped; further, that PSO's right to recover the goods would have been superior to the rights of Tennecomp's unsecured creditors.

3. For all practical purposes, the trustee no longer relies upon the fraudulent transfer theory under § 548 of the Code as initially asserted in her complaint.

PSO insists that it paid for the property which the trustee in bankruptcy wishes to reclaim and that the property was unique and clearly identified as belonging to PSO.

The trustee responds that, while the provisions of the Uniform Commercial Code cited by the defendant have application generally, they must give way in the instant case to the contractual provisions of the February 9, 1979, contract. The Oklahoma Code, Okla.Stat.Ann. tit. 12A § 1–102 entitled *Purposes; Rules of Construction; Variation by Agreement*, provides in pertinent part as follows:

"(3) The effect of provisions of this Act may be varied by agreement, . . . ."

Note 2 of the Uniform Commercial Code Comment in elaborating on this subsection states that—

"2. Subsection (3) states affirmatively at the outset that freedom of contract is a principle of the Code: . . : . "

In this regard, the trustee points out that the February 9, 1979, contract between Tennecomp and PSO provided for partial payments without regard to progress or performance. Further, Paragraph GC.33 of the General Conditions Section of the contract provides as follows:

"GC.33 *TRANSFER OF TITLE.* The transfer of title for equipment furnished under this Contract shall pass from the Contractor to the Company upon initial operation of the equipment."

In addition, the trustee asserts that the contract reflects that all insurance coverage, whether to be provided by Tennecomp or PSO, is geared to the job site in Inola, Oklahoma. (Paragraphs GC.24 through GC.27 of the General Conditions Section of the contract.) According to the trustee, these provisions reinforce Paragraph GC.33 as quoted above.

The trustee insists that under the agreement no title or interest in the computer security system to be developed under the February 9, 1979, contract would vest in PSO until "initial operation of the equipment." Thus, by agreement, the parties varied the provisions of the Uniform Commercial Code relied upon by PSO. Accordingly, the Code sections relied upon by PSO have no application to the instant case to the extent they are being utilized to vary the clear agreement of the parties.

Responding to the trustee's argument that the provisions of the Uniform Commercial Code can be varied by agreement of the parties, and that in this case the parties agreed that title would not pass until operation of the equipment, the defendant argues (1) that title is irrelevant and immaterial, and (2) that, if title is material or relevant, the exclusive reliance by the trustee on Paragraph GC.33 is misleading in determining what the parties agreed to in their contract regarding title in all situations. Defendant cites Paragraph GC.11 as follows:

"GC.11 *RIGHT OF COMPANY TO TERMINATE CONTRACT.* If the work to be done under this Contract is abandoned by the Contractor; . . . or if the Contractor is adjudged bankrupt; . . . the company shall have the right to terminate this Contract." [4]

.      .      .      .      .

"In the event of such termination, the Company shall have the right to take over the partially finished work and complete the work by separate contract. . . .'"

Also, the defendant points out that the trustee in this case filed an application to reject this executory contract, which application was granted by order of the court entered March 24, 1980.

### III

In order for a bankruptcy trustee to avoid a transfer as a preference pursuant to 11 U.S.C. § 547(b), several conditions must

---

**4.** The defendant recognizes that § 365(e) of the Bankruptcy Code makes such contractual provisions in a bankruptcy case inapplicable, but insists that Paragraph GC.11 still encompasses the "intention" of the parties and their agreement that the defendant would have the right to immediate possession of the property in the event that the contract was abandoned or the debtor adjudged bankrupt. P. 2, Defendant's Response to Plaintiff's Brief.

be met. The transfer must have been a transfer of the debtor's property, to or for the benefit of a creditor. The transfer must have been made for or on account of an antecedent debt. The debtor must have been insolvent when the transfer was made.[5] The transfer must have occurred within 90 days of the filing of the bankruptcy petition.[6] Finally, the transfer must enable the creditor to receive a greater percentage of his claim than he would receive under the distributive provisions of the Bankruptcy Code. 4 Collier on Bankruptcy ¶ 547.01 (15th ed. 1979).

Thus, the question to be determined is whether the transfer meets the requirements of § 547(b) of the Bankruptcy Code.[7] This determination requires a review of the sales provisions of the Uniform Commercial Code.

Section 2–501(1) of the Uniform Commercial Code provides that the identification of goods to a contract gives the buyer of the goods a "special property" in the goods. Okla.Stat.Ann. tit. 12A § 2–501(1). According to Oklahoma Code Comment, the U.C.C. has changed the rules of the common law and the Uniform Sales Act. Oklahoma Code Comment, § 2–401.

Before the enactment of the Uniform Commercial Code, the buyer's right to reclaim goods from an insolvent seller with possession of the goods depended upon the passage of "title." Without the passage of title the buyer would be treated as a general creditor. Under the Uniform Commercial Code the buyer's right to the goods is dependent upon the buyer obtaining a "special property" in the goods by virtue of the identification of the goods to the contract. 4B Collier on Bankruptcy ¶ 70.62A[7.2] (14th ed.). Therefore, the question of title has become "unimportant." The rights of the seller's creditors and the buyer's creditors and the remedies of the buyer and seller are determined without regard to title. Oklahoma Code Comment, § 2–401.

Goods are identified when they are "shipped, marked or otherwise designated by the seller as goods to which the contract refers." Okla.Stat.Ann. tit. 12A § 2–501(1)(b). The affidavit of Thomas Davis Adams submitted by PSO in support of its motion for summary judgment supports PSO's contention that the goods shipped to Tennecomp on February 14, 1980, had been previously identified to the contract. Mr. Adams stated that Tennecomp had two methods for procuring parts for the products and systems it sold. For standard products Tennecomp maintained a general inventory from which standard parts and assemblies were built. The second method was used in the construction of special computer system projects. The major pieces and assemblies of equipment would be purchased directly from the vendor without going through Tennecomp's general inventory. According to Mr. Adams, as specially ordered items from the PSO job were received, they were inspected, tagged with the PSO job number (AO3017) and placed in the "staging area" for the PSO job. He also stated that all equipment and materials that were to be used in the PSO job were tagged with the PSO job number. Mr. Adams stated that the items specially ordered for the PSO project were never placed in Tennecomp's general inventory but were placed immediately in the "staging area." Affidavit of Thomas Davis Adams, Exhibit B to Defendant's Motion for Summary Judgment.

■ Considering the affidavit of Thomas Adams in conjunction with the affidavit of Charles L. Horn, Vice President—Finance for Forney Engineering Company, the court concludes that the goods shipped to PSO's project in Inola, Oklahoma, on February 14, 1980, had been previously identified to the contract so that PSO had acquired a "special property" in those goods.

---

5. Insolvency is "presumed" during the ninety day period. 11 U.S.C. § 547(f).

6. As to "insiders," a defined term, 11 U.S.C. § 101(25), the trustee may recover a transfer of property if made within one year.

7. It will be noted that the trustee does not allege rights under 11 U.S.C. § 544, Trustee as a lien creditor.

While such identification of goods gives the buyer an insurable interest, it generally does not result in the passage of title. The identification may, however, give the buyer the right to recover the goods upon the seller's default or repudiation, § 2–711(2)(a).[8] In addition, the buyer may, under certain circumstances, have a right to replevy the goods. § 2–716. 2 Anderson, Uniform Commercial Code § 2–501:5 (2d ed. 1971).

In the present case the goods had been identified to the contract before they were shipped to PSO. Under the terms of the contract, however, the "Transfer of Title" was not to occur until initial operation of the equipment. Before the advent of the U.C.C., if a buyer had advanced the purchase price, secured the title, and received possession within four months prior to the filing of the seller's bankruptcy petition, the transfer was not considered to be a preference. Bankruptcy and Article Two of the Uniform Commercial Code: The Right to Recover the Goods Upon Insolvency, 79 Harv.L.Rev. 598, 605 (1966). However, if the buyer had not received title to the goods, the trustee could recover the goods as a preference. *Quittner v. Los Angeles Steel Casting Co.*, 202 F.2d 814 (9th Cir. 1953).

After the enactment of the U.C.C., the issue of title became "unimportant" in sales transactions. Oklahoma Code Comment, § 2–401. Because the question of whether the buyer has acquired a "special property" in the goods by virtue of their identification has supplanted the question of whether title has passed, one commentator has observed that:

"The deemphasis of and change in the concept of title along with the development of the special property interest created by identification under the Code pose special problems when applied in a preference case... If it is concluded that the old cases are still valid, so that there is no preference in receiving the

goods once title has passed, a similar result should follow when the buyer has a special property interest created by identification under Section 2–501. Although the acts constituting an identification are less burdensome to the seller than the acts necessary for passing title, it is difficult to distinguish between the two in any meaningful sense." Bankruptcy and Article Two of the Uniform Commercial Code: The Right to Recover the Goods Upon Insolvency, 79 Harv.L.Rev. 598, 606 (1966).

"Under pre-Code law, the buyer's right to reclaim depended upon passage of title with all the incidents under the Uniform Sales Act of unconditional appropriation, specificity, etc., involved. If title had not passed, buyer was treated as a general creditor. The U.C.C. makes the buyer's right dependent not upon title but upon his obtaining a special property in the goods which amounts to the goods being identified to the contract." 4B Collier on Bankruptcy, ¶ 70.62A[7.2] (14th ed.).

The thrust of the trustee's argument is that "title" had not passed to PSO. However,

"In some instances, it is unnecessary to determine whether a particular person has title for in some situations he may have a special property interest in the goods which for the purpose of the pending action may be sufficient." 2 Anderson, Uniform Commercial Code § 2–401:5 (2 ed. 1971).

Section 2–402(1) states that except as provided in subsections (2) and (3) rights of *unsecured* creditors of the seller with respect to goods which have been identified to a contract for sale are subject to the buyer's rights to recover the goods under the Article. Subsection (2) states that a creditor of the seller may treat a sale or identification to a contract for sale as void if as against him a retention of possession by the seller is fraudulent under any rule of law of the state where the goods are located, except

---

8. Section 2–711(2)(a) refers to § 2–502. The latter section gives the buyer the right to recover the goods in the event of the seller's insolvency within ten days after receipt of the first installment on their price.

that retention of possession in good faith and current course of trade by a merchant-seller for a commercially reasonable time after a sale or identification is not fraudulent. Subsection (3) states that nothing in this Article shall impair the rights of creditors of the seller: (a) under the provisions of the chapter on Secured Transactions; or (b) where identification to the contract or delivery is made not in a current course of trade but in satisfaction of or as security for a pre-existing claim for money, security or the like and is made under circumstances which under rule of law of the state where the goods are situated would apart from this Article constitute the transaction a fraudulent transfer or voidable preference. Okla.Stat.Ann. tit. 12A § 2–402. T.C.A. § 47–2–402.

From the record before this court it cannot be determined whether retention of the goods by the debtor was beyond a commercially reasonable time, the contract requiring delivery of the goods not later than *September 1, 1979.*

Section 2–716, also relied upon by PSO, states the buyer's right to specific performance or replevin. Specific performance may be decreed where the goods are unique or in other proper circumstances. Further, the buyer has a right of replevin for goods "identified to the contract" if after reasonable effort he is unable to effect cover for such goods. The test of uniqueness under this section would be made in terms of the total situation which characterizes the contract. "Thus, specific performance could be granted if the chattel was difficult to purchase on the open market. . . ." Oklahoma Code Comment, § 2–716.

### IV

██ What has been said so far leads inevitably to two conclusions: (1) Title to the goods had not passed to PSO on February 14 or 18, 1980,[9] the parties agreeing that "title. . .[would] pass. . .upon initial operation of the equipment." Paragraph GC.33 of the General Conditions Section of the

Contract. (2) By identification of the goods to the contract, PSO obtained a "special property" in the goods. Okla.Stat.Ann. tit. 12A § 2–501(1).

Thus, the question to be determined by the court is whether this "special property" insulates PSO from the provisions of § 547 of the Bankruptcy Code.

One of the elements of a preference is a "transfer of property of the debtor." 11 U.S.C. § 547(b). Sec. 101(40) states that "'transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or of parting with property or with an interest in property . . . ."

Section 541(a)(1) of the Code states that the commencement of a case creates an "estate." This estate is comprised, with exceptions not pertinent, of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

A review of the contract and attachments indicates that delivery of the proposed equipment was to be made not later than "9–1–79." Further, installation and demonstration of the system operation was to be completed by "10–1–79." *See* letter dated January 12, 1979, Tennecomp to PSO. The record is silent as to why the shipment did not occur until several months thereafter, on the eve of bankruptcy, and after PSO had been advised that a petition in bankruptcy was to be filed. The equipment shipped to PSO on February 14, 1980, had a reputed value of $100,107.00.

The theory of bankruptcy administration is that equality between creditors of the same class is equity, and that such equity can be achieved only by setting aside preferences in favor of a few, who, but for this rule, would by their diligence obtain a greater and an unjust share of the debtor's estate. 4 Collier on Bankruptcy ¶ 547.08[1] (15th ed.).

Assuming a supplier furnished goods on an unsecured basis to the debtor within 90

9. The goods were shipped by Tennecomp on February 14, 1980, received by PSO on February 18, 1980. Tennecomp's bankruptcy petition was filed February 15, 1980.

days of bankruptcy, that those goods were "identified" to a contract, should the buyer have rights in the goods superior to the rights of the seller of those goods, and a trustee in bankruptcy representing all creditors? In the case before this court, actual facts can be supplied to this hypothetical. On or about November 24, 1979, the debtor purchased equipment of the value of $48,-319.54 from Digital Equipment Corporation. When the equipment was received, it was tagged and "identified" to the PSO contract. *See* Exhibit B, Defendant's Motion for Summary Judgment. Is Digital the supplier, to be treated as an unsecured creditor of the debtor, while PSO receives the unpaid-for equipment?[10] If this is true, equal distribution to all creditors of the same class is defeated. In effect, this enables an insolvent seller by his unilateral act to identify goods or pass title and thus prefer one creditor over another, even though both are in the same class.

Partial payments made by PSO to the debtor occurred many months prior to the shipment of the goods, the last payment being made on August 27, 1979,[11] with the goods not being shipped until February 14, 1980. The inescapable conclusion is that a debt existed between the dates of the partial payments and the date of shipment.

Professor Kennedy has commented on the creditor status of the buyer where goods have been identified to a contract:

"In the interval between the advance...by the buyer and the identification of the goods pursuant to § 2–501 of the Code, however, the buyer can hardly be other than a creditor of the seller—at least where the sum advanced does not remain identifiable... Insofar as identification is effective to create a special property in the buyer, it is ordinarily a transfer to a creditor then. While the buyer is entitled to replevy goods identified to a contract under certain circumstances particularized in § 2–716, the Code is careful not to equate identification to the passing of title to the goods; rather identification is said generally to give the buyer only a 'special property.' U.C.C. § 2–401(1). Until the special property...is perfected against a lien creditor of the seller, the transfer cannot be deemed to have occurred for the purpose of § 60 of the Bankruptcy Act. If it occurs over three weeks after the payment to the seller,[12] it appears to be a transfer to one who is a creditor on account of an antecedent debt." F. Kennedy, The Trustee In Bankruptcy Under the Uniform Commercial Code: Some Problems Suggested by Articles 2 and 9, 14 Rutgers L.Rev. 518, 559 (1960).

The trustee is a judgment lien creditor. 11 U.S.C. § 544(a). It is undisputed that PSO did not perfect a "special property" in the goods pursuant to Article 9 of the Uniform Commercial Code.

*See* V. Countryman, Buyers And Sellers of Goods in Bankruptcy, 1 New Mexico L.Rev. 435 (1971).

Section 2–502 of the Uniform Commercial Code states that with an exception not pertinent a buyer who has paid a part or all of the price of goods in which he has a special

---

**10.** The record in this case indicates that the debtor paid Digital for the equipment on February 1, 1980. Check No. 1761, in the amount of $48,319.54. The trustee, however, on July 8, 1980, instituted a preference action against Digital to recover this sum (and another payment of $110,759.14) as a preference, Adv.Proc. No. 3–80–0314. On March 24, 1981, an order of compromise and dismissal was entered under which Digital paid the trustee the sum of $143,-200.00. Thus, Digital, a supplier of the equipment now claimed by PSO, has paid the penalty imposed by § 547. Is PSO to be treated differently because the goods were "identified" to PSO's contract?

**11.** "Progress payments" were keyed to elapsed time after the date of the contract:

| Days after Contract Award | Percent Due |
|---|---|
| 30 | 20 |
| 60 | 30 |
| 120 | 30 |
| 180 | 10 |
| Upon final acceptance | 10 |

**12.** Sec. 60(a)(7) of the Bankruptcy Act permitted a maximum of twenty-one days (unless applicable law required a shorter time) for perfection of a transfer within the meaning of sec. 60(e).

property under the provisions of § 2–501 may recover them from the seller if the seller becomes insolvent within ten (10) days after receipt of the first installment on their price.

The comments to the Official Text state that § 2–502 gives an additional right to the buyer as the result of identification of goods to the contract. The buyer is given a right to the goods on the seller's insolvency occurring within 10 days after he receives the first installment on this price. The Comment goes on to state, however—

"The question of whether the buyer also acquires a security interest in identified goods and has rights to the goods when insolvency takes place after the ten-day period provided in this section depends upon compliance with the provisions of the Article (Chapter) on Secured Transactions (Article [Chapter] 9)."

### V

The question whether summary judgment is appropriate in any case is one to be decided upon the particular facts of that case. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

Complexity alone does not justify the denial of a motion for summary judgment if it is otherwise proper; that is, when the material factual issues are not in dispute and they furnish an adequate basis for the application of the proper legal principles. *Morr v. United States*, 243 F.2d 913 (6th Cir. 1957).

In *S. J. Groves & Sons Company v. Ohio Turnpike Commission*, 315 F.2d 235 (6th Cir. 1963), the court held that a motion for summary judgment should not be granted where the case involves complex facts and issues and is one where full inquiry into the facts under usual trial procedure is advisable to develop the facts. The court stated:

"This Court has on several occasions expressed the view that a trial judge should be slow in disposing of a case of any complexity on a motion for summary judgment, that while such a judgment wisely used is a praiseworthy and time-saving device, yet such prompt dispatch

of judicial business is neither the sole nor the primary purpose for which courts have been established, and that a party should not be deprived of an adequate opportunity to fully develop his case by witnesses and a trial, when the issues involved made such procedure the appropriate one." (Citations omitted). *Id.* at 237.

The court further stated at pp. 237–238: "It is often the case that although the basic facts are not in dispute, the parties in good faith may nevertheless disagree about the inferences to be drawn from these facts, what the intention of the parties was as shown by the facts, or whether an estoppel or a waiver of certain rights admitted to exist should be drawn from such facts. Under such circumstances the case is not one to be decided by the Trial Judge on a motion for summary judgment." (Citations omitted). *Id.*

The above case was followed and quoted extensively in *Hart v. Johnston*, 389 F.2d 239 (6th Cir. 1968).

Defendant's motion for summary judgment will be denied.

Submit order within five days.